No. 21-10449

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**In the Matter of: Highland Capital Management, L.P.**

**Debtor.**

**NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; HIGHLAND INCOME FUND; NEXPOINT STRATEGIC OPPORTUNITIES FUND; HIGHLAND GLOBAL ALLOCATION FUND; NEXPOINT CAPITAL, INCORPORATED; JAMES DONDERO;THE DUGABOY INVESTMENT TRUST; GET GOOD TRUST,**

**APPELLANTS**

**v.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

**APPELLEE**

ON DIRECT APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS
BANKRUPTCY CASE NO. 19-34054-11 (SGJ)

### APPELLEE'S MOTION TO DISMISS APPEALS AS EQUITABLY MOOT

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz
Ira D. Kharasch
Harry Hochman
Gregory V. Demo
Judith Elkin
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910

**HAYWARD PLLC**
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

**ATTORNEYS FOR APPELLEE**

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. **Appellants:**

   **NexPoint Advisors, L.P.**
   **Highland Capital Management Fund Advisors, L.P. (collectively, the "<u>Advisors</u>")**

   Counsel for the Advisors:
   MUNSCH HARDT KOPF & HARR, P.C.
   Davor Rukavina
   Julian Vasek
   500 North Akard Street, Suite 3800
   Dallas, Texas 75201-6659
   Telephone: (214) 855-7500
   Facsimile: (214) 855-7584

   **James Dondero ("<u>Dondero</u>")**

   Counsel for James Dondero:
   BONDS ELLIS EPPICH SCHAFER JONES LLP
   John Y. Bonds, III
   Clay M. Taylor
   Bryan C. Assink
   420 Throckmorton Street, Suite 1000
   Fort Worth, Texas 76102
   Tel: (817) 405-6900

   **Highland Income Fund**
   **NexPoint Strategic Opportunities Fund**
   **Highland Global Allocation Fund**
   **NexPoint Capital, Inc. (collectively, the "<u>Funds</u>")**

Counsel for the Funds:
K&L GATES LLP
Artoush Varshosaz
1717 Main Street, Suite 2800
Dallas, TX 75201
Tel: (214) 939-5659

A. Lee Hogewood, III
Emily Mather
4350 Lassiter at North Hills Ave., Suite 300
Raleigh, NC 27609
Tel: (919) 743-7306

David R. Fine
Market Square Plaza
17 N. Second Street, 18th Floor
Harrisburg, PA 17101
Tel: (717) 231-5820

**Get Good Trust**
**The Dugaboy Investment Trust (collectively, the "<u>Trusts</u>")**

Counsel for the Trusts:
HELLER, DRAPER & HORN, L.L.C.
Douglas S. Draper
Leslie A. Collins
Greta M. Brouphy
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300

2.    **Appellee (Debtor):**

**Highland Capital Management, L.P.**

Counsel for Appellee:
PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz
Ira D. Kharasch
Harry Hochman
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910

John A. Morris
Gregory V. Demo
Judith Elkin
780 Third Avenue
34th Floor
New York NY 10017-2024
Tel: (212) 561-7700

ROBBINS, RUSSELL, ENGLERT, ORSECK & UNTEREINER LLP
Roy T. Englert, Jr.
Matthew M. Madden
John B. Goerlich
2000 K Street NW
Washington, DC 20006
Tel: (202) 775-4500

HAYWARD PLLC
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

                                        */s/Zachery Z Annable*
                                        Zachery Z. Annable

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..............................................................................1

BACKGROUND ...............................................................................................3

ARGUMENT ..................................................................................................10

    A.    Appellants Did Not Obtain a Stay Pending Appeal. ..........................11

    B.    The Plan Has Been Substantially Consummated. ..............................11

    C.    Appellants' Requested Relief Would Impair the Plan's Success and the Rights of Third Parties Relying on the Plan. .........................14

CONCLUSION ................................................................................................20

CERTIFICATE OF COMPLIANCE .....................................................................22

CERTIFICATE OF CONFERENCE .....................................................................23

CERTIFICATE OF SERVICE ............................................................................24

# TABLE OF AUTHORITIES

## CASES

*Bank of New York Trust Co., NA v. Official Unsecured Creditors' Committee*

*(In re Pacific Lumber Co.)*,
    584 F.3d 229 (5th Cir. 2009) .......................................................................... 10, 15

*Hilal v. Williams (In re Hilal)*,
    534 F.3d 498 (5th Cir. 2008) ...................................................................... 1, 10, 15

*In re Berryman Prods., Inc.*,
    159 F.3d 941 (5th Cir. 1998) ................................................................................11

*In re UNR Industries, Inc.*,
    20 F.3d 766 (7th Cir. 1994) .................................................................................11

*Insurance Subrogation Claimants v. U.S. Brass Corp. (In re U.S. Brass Corp.)*,
    169 F.3d 957 (5th Cir. 1999) ...............................................................................14

*Manges v. Seattle-First National Bank (In re Manges)*,
    29 F.3d 1034 (5th Cir. 1995) ..................................................................... passim

*TNB Fin., Inc. v. James F. Parker Interests (In re Grimland, Inc.)*,
    243 F.3d 228 (5th Cir. 2001) ...............................................................................10

*U.S. ex rel. FCC v. GWI PCS 1, Inc. (In re GWI PCS 1, Inc.)*,
    230 F.3d 788 (5th Cir. 2000) ...............................................................................14

## STATUTES

11 U.S.C. § 1101(2) ..............................................................................................12

Appellee and Debtor Highland Capital Management, L.P., ("Debtor" or "Highland") respectfully moves this Court to dismiss, as equitably moot, Appellants' consolidated appeals from the bankruptcy court's *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* (the "Confirmation Order" or "CO").[1]

## PRELIMINARY STATEMENT

This Circuit has long recognized that there are circumstances in which appellate courts can no longer equitably "order fundamental changes in reorganization cases." *Hilal v. Williams (In re Hilal)*, 534 F.3d 498, 500 (5th Cir. 2008) (quoting *Manges v. Seattle-First National Bank (In re Manges)*, 29 F.3d 1034, 1039 (5th Cir. 1995)). That doctrine of equitable mootness safeguards third parties' reasonable reliance on an unstayed bankruptcy court's order confirming a reorganization plan, and avoids value-destructive attempts to unwind the many intricate transactions that take place upon a plan's effectiveness and consummation.

All three factors this Court uses to evaluate the equitable mootness of a confirmation appeal in Chapter 11 bankruptcy cases favor dismissal of the consolidated appeals.

*First*, there is no dispute that Appellants did not obtain a stay of the Confirmation Order pending their appeals. They requested a stay, but failed to

---

[1] ROA.4-93. Attached to the Confirmation Order is the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, including certain amendments filed on February 1, 2021 (as amended, the "Plan") ROA.95-164, 1427-74. All capitalized terms used but not defined herein have the meanings given to them in the Plan.

satisfy any court that they met the standards for obtaining temporary relief from the bankruptcy court's order. And when Appellants were seeking a stay, they explicitly did so on the ground that, without a stay, their appeals were likely to be dismissed as equitably moot once the Plan went effective and was substantially consummated.

*Second*, the Plan *has* gone effective and *has* been substantially consummated. The Plan was confirmed on February 22, 2021 and its Effective Date occurred on August 11, 2021. Since the Effective Date, there has been a flurry of activity implementing the Plan. New legal entities have succeeded the Debtor. A third party, with no prior role in the case, has infused $45 million in exit financing into the reorganized entities. And significant distributions have already been made to numerous creditors—including sizable payments to settle previously outstanding, but now resolved, litigation against the estate.

*Finally*, knocking the props out from under the confirmed and consummated Plan would jeopardize numerous third parties' reasonable reliance on the Plan. The new lender invested in the Reorganized Debtor in reliance on the Plan; creditors have justifiably relied on the payments they have already received; and individuals and new entities have been depending on the Plan's safeguards from Appellants' incessant litigation campaign while they have been working to consummate and implement the reorganization for the benefit of creditors. Reversing the Confirmation Order now—which is what every Appellant explicitly asks this Court to do on each and every issue in these appeals—would generate untold chaos to the

substantial and irreversible detriment of these third parties.  Indeed, it may no longer even be realistically possible to put the genie back in the bottle.

These appeals should be dismissed as equitably moot.

## BACKGROUND

As the bankruptcy court aptly recognized, this is anything but a "garden variety Chapter 11 case."[2]  ROA.9-10, CO ¶4.  Highland, a registered investment advisor responsible for a complex web of funds and portfolios, was not pushed into bankruptcy by high loan debt, depressed cash flows, or any of the other usual reasons that companies find themselves in financial trouble.  ROA.11-12, CO ¶8.  Rather, Highland was compelled to seek bankruptcy protection because of an onslaught of litigation and judgments against it resulting from its history as an aggressive "serial litigator."  ROA.11-12, 58-59, CO ¶¶8, 77.  Indeed, nearly all of Highland's major creditors were either entities that held awards or claims against it or vendors or attorneys that worked for Highland during its various litigation campaigns but had not been paid.  ROA.11-15, CO ¶¶8-10.

Highland's litigious history foreshadowed its litigious bankruptcy.  Indeed, Highland's co-founder, Appellant James Dondero,[3] threatened to "burn the place

---

[2] A comprehensive summary of Highland's bankruptcy case and related background facts is found in Appellee's Brief on the merits of the appeals filed contemporaneously with this motion.

[3] Mr. Dondero was removed (with his agreement) from his control positions with the Debtor effective January 9, 2020 at the request of the Unsecured Creditors' Committee (the "Committee") and the U.S. Trustee who were concerned about the Debtor's ability to act as a fiduciary because of Dondero's well-known history of self-dealing, fraud, and other misconduct.  On that date, the bankruptcy court approved a corporate governance settlement which created both an independent board of directors and well as certain operational protocols.  ROA.14-18, CO ¶11-14.

down" if he didn't get his way during plan negotiations. ROA.1592, 2/2/21 Tr. at 105:10-20. He did not get his way, and since then he and his related entities, including the other Appellants, have challenged every jot and tittle through (and beyond) confirmation of Highland's reorganization Plan. *See* ROA.58-60, CO ¶¶77-78.[4]

Nevertheless, with the assistance of accomplished bankruptcy mediators, Highland and its key constituencies settled their differences and agreed on the terms of Highland's reorganization. ROA.18-19, CO ¶15. In a resolution that the bankruptcy court called "nothing short of a miracle," Highland's Plan proposed to form a Claimant Trust and Litigation Sub-Trust to manage and sell assets, and pursue claims against, among others, the Appellants, over the period of time necessary to accomplish its tasks for the benefit of Highland's creditors (including its many litigation adversaries). *Id.* That settlement and the resulting Plan allowed Highland to avoid a free-fall liquidation and fire-sale of its assets that would have been to the detriment of all its creditors. Not surprisingly, creditors holding 99.8% of the value of the unsecured claims against Highland supported the Plan. ROA.9, CO ¶3.

To ensure the Plan's success, end the constant litigation, and allow Highland's successors to focus on maximizing creditor distributions through an orderly monetization of its assets, the Plan (i) enjoined actions designed to interfere with the

---

[4] This pattern of harassment has continued post-confirmation. Since confirmation, additional lawsuits have been filed by Appellant Dondero and other Dondero-related entities not party to this appeal and Highland has been forced to defend against actions taken by Dondero and other Dondero-related entities with contempt motions, which have been granted.

Plan's implementation and consummation (the "Injunction"), (ii) exculpated certain parties for their acts taken in support of the Plan that were not grossly negligent, taken in bad faith, willful, or criminal (the "Exculpation"), and (iii) required the bankruptcy court to pre-approve certain lawsuits against Highland's successors and other bankruptcy participants as being colorable before they could be filed and proceed in whatever court would have jurisdiction over such claims (the "Gatekeeper Provision"). *See generally* ROA.8-9, 34-35, 51-62, CO ¶¶2, 42, 70-81; ROA.147-151, Plan Art. IX.C, D, F. These three "Plan Protections," the bankruptcy court found, are "integral elements of the transactions incorporated into the Plan"; "inextricably bound with the other provisions of the Plan"; and "confer material benefits on, and are in the best interests of, the Debtor, its Estate, and its creditors." ROA.51-52, CO ¶70.

Although Highland was able to resolve most parties' objections to its Plan prior to confirmation, Appellants persisted in challenging the Plan Protections and certain other key plan provisions. The bankruptcy court held a two-day evidentiary hearing, after which it denied Appellants' objections and entered an order confirming the Plan on February 22, 2021. *See generally*, ROA.4-93, CO. In doing so, the bankruptcy court acknowledged Appellant Dondero as a "serial litigator" who owns or controls the other Appellants, each of which is "marching pursuant to the orders or Mr. Dondero." ROA.23, CO ¶19. The bankruptcy court explicitly questioned Appellants' "good faith" in objecting to the plan, especially given the

"noteworthy" "remoteness of their economic interests" in the issues they were raising and in the estate more generally. ROA.20-21, CO ¶17. The bankruptcy court explained that, based on the record, it had "good reason to believe that these parties are not objecting to protect economic interests they have in the Debtor but to be disruptors." *Id.* The mere fact that Dondero "wants his company back," the court emphasized, "is not a good faith basis to lob objections to the Plan." *Id.*

Appellants appealed,[5] and sought a stay of the confirmation order from the Bankruptcy Court,[6] the District Court[7] and this Court.[8] When seeking a stay, Appellants acknowledged that, without a stay, Highland's confirmed Plan would become effective and be substantially consummated, thereby likely rendering their appeals equitably moot. Every court from which Appellants sought a stay nevertheless denied their applications and permitted the plan to go effective and be consummated.[9] [10] [11]

Just as Appellants predicted, Highland's confirmed Plan has since gone effective and been substantially consummated. On August 11, 2021, Appellants filed a Notice of Effective Date in the bankruptcy court. [D.I. 2700]. Since the

---

[5]  D.I. 1957, 1966, 1970, and 1972.

[6]  D.I. 1955, 1967, 1971, and 1973.

[7]  District Court Case Nos. 3:21-cv-550 (Docket No. 5); 3:21-cv-538, 3:21-cv-539 and 3:21-cv-546 (consolidated).

[8]  Fifth Cir. Case No. 21-10449, Document 515869234.

[9]  D.I. 2084 and 2095.

[10]  Fifth Cir. Case No. 21-10449, Document 515906886.

[11]  District Court Case Nos. 3:21-cv-550, Docket No. 18.

Effective Date, numerous transactions and events have taken place that have substantially consummated the confirmed Plan.

For example, a $45 million exit facility with Blue Torch Capital ("Blue Torch") has been consummated (the "Exit Facility"), under which Blue Torch has already funded (i) a $25 million term note issued by the Reorganized Debtor and (ii) a $20 million term note issued by a portfolio company indirectly owned by the Reorganized Debtor (the "Portfolio Company"). Moreover, all claims required to be paid on the Effective Date (approximately $2.2 million) have been paid and distributions totaling $5.1 million have been paid to holders of allowed Convenience Class Claims. And Highland has assumed contracts necessary for the Reorganized Debtor's and Claimant Trust's operation—including contracts under which they manage 20 collateralized loan obligations with approximately $700 million in assets—and made cure payments in the amount of $525,000 to the applicable counterparties.

In addition, as set forth in the *Declaration of James P. Seery* filed in support of this Motion:

- The Debtor's prepetition limited and general partnership interests have been cancelled and cease to exist and the post-petition court-approved independent directors have resigned.

- A Claimant Trust has been established as a Delaware liquidating trust, and new limited partnership interests have been issued to the Claimant Trust as the sole limited partner of the Reorganized Debtor.

- HCMLP GP LLC ("New GP") has been incorporated as a wholly owned subsidiary of the Claimant Trust, and is the Reorganized Debtor's general partner.

- All of the Debtor's former assets have been transferred to the Reorganized Debtor or to the Claimant Trust, as applicable.

- The Reorganized Debtor obtained a new EIN as of the Effective Date, employs 12 people under employment contracts and is withholding taxes under the new EIN.

- The Claimant Trust's owners are the Claimant Trust Beneficiaries, comprised of the holders of Class 8 and Class 9 claims under the Plan.

- The Claimant Trust Oversight Committee ("TOC") has been appointed to manage and oversee the Claimant Trust and consists of designees of two of the largest creditors of the Debtor and a third independent director with no prior involvement with Highland or the bankruptcy case. [D.I. 2801]

- A Litigation Sub-Trust also has been created, as a sub-trust of the Claimant Trust, and Marc Kirschner has been appointed as the Litigation Trustee. Mr. Kirschner is a senior managing director at Teneo, and had no involvement with Highland prior to his 2021 retention as a litigation consultant to the Committee. Mr. Kirschner is actively investigating the Debtor's causes of action and anticipates filing lawsuits on such causes of action on or before October 16, 2021.

- The ownership of certain Estate Claims, as defined in the Plan, has been transferred to the Litigation Sub-Trust.

- An Indemnity Trust has been established as a special-purpose-vehicle collateral trust to secure any obligations to indemnify claims that arise against the Reorganized Debtor, Claimant Trust, Litigation Sub-Trust, Claimant Trustee, Litigation Trustee, or TOC members.

- The Indemnity Trust has been funded with $2.5 million cash from the Reorganized Debtor and a note issued by the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust in an amount equal to $25 million less the value of assets held by the Indemnity Trust.

- The Exit Facility is fully guaranteed by the Reorganized Debtor, the Claimant Trust, and the Reorganized Debtor's material operating subsidiaries and secured by substantially all of those guarantors' assets.

- The $5.1 million already paid to unsecured creditors holding allowed Class 7 Convenience Claims represents 77% of all Class 7 claims filed. The process of resolving and paying additional Convenience Claims is ongoing.

- All claims required to be paid in cash on the Effective Date have been paid. These claims totaled approximately $2.2 million in the aggregate and included a cash payment to major litigation creditor Acis as required under the Acis settlement agreement.

- Class 2 secured creditor Frontier State Bank ("Frontier") has been paid all accrued and unpaid interest outstanding on the Frontier note in the approximate amount of $500,000, and the Reorganized Debtor has issued the New Frontier Note to Frontier in the principal amount of approximately $5.2 million secured by approximately $23 million of the Reorganized Debtor's assets.

- Payments in the aggregate amount of $165,412 have been made to holders of Other Secured, Priority Non-Tax and Priority Tax Claims.

- Due to the occurrence of the plan's effective date, Jefferies, a secured creditor of Highland, has withdrawn its claim against the Debtor.

Despite all of this activity implementing and substantially consummating Highland's confirmed Plan, these appeals assert the Plan should not have been confirmed and must be reversed on multiple grounds. Specifically, Appellants assert that the Plan was not confirmable with the Plan Protections, because it violates the absolute priority rule, because of Debtor's pre-confirmation reporting deficiencies, and because of the discharge being granted to the Debtor. Each Appellant thus seeks, on one or more of those grounds, this Court's reversal of the Confirmation Order

and remand to the bankruptcy court for new plan proceedings.  Advisors Br. at 43;

Trusts Br. at 21; Funds Br. at 34; Dondero Br. at 2.

## ARGUMENT

A bankruptcy appeal from a confirmed plan "is equitably moot" whenever the

plan "has been so substantially consummated that a court can order no effective relief

even though there may still be a live dispute between the parties." *TNB Fin., Inc. v.*

*James F. Parker Interests (In re Grimland, Inc.)*, 243 F.3d 228, 231 (5th Cir. 2001).

This Circuit has repeatedly emphasized that "there is a point beyond which

[appellate courts] cannot order fundamental changes in reorganization cases." *In re*

*Hilal*, 534 F.3d at 500 (quoting *In re Manges*, 29 F.3d at 1039).  The dismissal of

confirmation appeals on equitable-mootness grounds thus "rests on the need for

finality, and the need for third parties to rely on that finality, in bankruptcy

proceedings." *In re Grimland*, 243 F.3d at 231.

When determining whether an appeal from a bankruptcy court's confirmation

order should be dismissed as equitably moot, this Court has articulated a three-part

inquiry: (1) whether a stay was obtained, (2) whether the plan has been "substantially

consummated," and (3) whether the relief requested would affect either the rights of

parties not before the court or the success of the plan. *Bank of New York Trust Co.,*

*NA v. Official Unsecured Creditors' Committee (In re Pacific Lumber Co.)*, 584 F.3d

229, 240 (5th Cir. 2009).  All three of those factors demonstrate the equitable

mootness of Appellants' challenges to Highland's confirmed Plan.

**A.    Appellants Did Not Obtain a Stay Pending Appeal.**

"The first question in a mootness inquiry is whether the appellants secured a stay to prevent execution of the Plan." *In re Berryman Prods., Inc*., 159 F.3d 941, 944 (5th Cir. 1998).  In that regard, it makes no difference whether the Appellants tried to secure a stay; the only relevant issue is whether they actually obtained one. *Id.* (rejecting argument that the diligent but unsuccessful pursuit of stay is sufficient); *see also In re UNR Industries, Inc.*, 20 F.3d 766, 770 (7th Cir. 1994) ("A stay not sought, and a stay sought and denied, lead equally to the implementation of the plan of reorganization.")

Here, Appellants sought a stay of the Confirmation Order—arguing, among other things, that an unstayed order was likely to result in a consummated plan that would contribute to equitably mooting their appeals.[12]  But their stay motions were denied, and the confirmed Plan was allowed to go effective and be consummated notwithstanding their pending appeals.

**B.    The Plan Has Been Substantially Consummated.**

The Bankruptcy Code defines "substantial consummation" as the "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by. . . the successor to the debtor. . . of the business or of management of all or substantially all of the property dealt with by the plan; and

---

[12] *See* Advisors Stay Motion (D.I. 1955) ¶¶49-50; Funds Stay Brief (D.I. 1967) ¶¶22, 38; Advisors Stay Brief (Docket No. 3) ¶2; Fifth Cir. Case No. 21-10449, Advisors Stay Brief, Document 515869234 at pp. 19, 23; Advisors Reply, Document 515885828 at p. 9.

(C) commencement of distribution under the plan." 11 U.S.C. § 1101(2).[13] Highland's plan has been substantially consummated.

*First*, all of the property of the Debtor's estate has been transferred to the Reorganized Debtor or Claimant Trust pursuant to the Plan. Seery Decl. ¶11(i). The Estate Claims (*i.e.*, certain causes of action that formerly belonged to the Debtor) have been transferred to the Litigation Sub-Trust. *Id.* ¶11(j). The general and limited partnership interests of the Debtor have been extinguished. *Id.* ¶11(e). The independent directors have all resigned their positions. *Id.* ¶11(b).

*Second*, the Reorganized Debtor and Claimant Trust have completely taken over the management of Highland's business and former property for purposes of managing an orderly wind-down of its asset portfolios and making further distributions to creditors. Seery Decl. ¶¶9, 11. The new corporate ownership structure contemplated by the Plan has been put into place. The Reorganized Debtor has issued partnership interests to its sole limited partner, the Claimant Trust, and to New GP, a wholly owned subsidiary of the Claimant Trust. *Id.* ¶11(a), (c), (f), (g), (h), and (t). The TOC has been put into place and has appointed James Seery, the Reorganized Debtor's chief executive officer, as trustee of the Claimant Trust. *Id.* ¶11(c).

---

[13] Substantial consummation is determined based on the extent of plan consummation at the time this Court reviews the mootness issue. *In re Manges*, 29 F.3d at 1041 ("Mootness is evaluated by the reviewing court, which may take notice of facts not available to the trial court if they go to the heart of the court's ability to review.").

*Finally*, distributions to Debtor's creditors are well underway. As set forth in detail in the Seery Declaration, the Reorganized Debtor has made distributions to various creditors, including Acis, Frontier, and various secured, tax and priority creditors in a total amount of approximately $2.8. Seery Decl. ¶11(m), (o), and (s). Cure payments totaling approximately $500,000 has been paid to counterparties under assumed executory contracts. *Id.* ¶11(u). An additional $5.1 million has been distributed to the holders of Convenience Class claims, which represents the payment in full of 77% of such claims. *Id.* ¶11(r).

And that's not all. The Reorganized Debtor also has issued an approximately $6 million new secured note to Frontier, as contemplated by the Plan, and entered into a $45 million fully-funded Exit Facility with Blue Torch, a U.S.-based middle market specialty lender. Seery Decl. ¶11(o) and (p). Additionally, an Indemnity Trust has been created to pay any indemnification claims that may arise and funded with $2.5 million; the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust have also issued a $25 million note to the Indemnity Trust. *Id.* ¶11(k) and (l).

All of these actions demonstrate the Plan's substantial consummation. This Court has explained that "the 'substantial consummation' yardstick" was adopted as part of the equitable-mootness analysis "because it informs our judgment as to when finality concerns and the reliance interests of third parties upon the plan as effectuated have become paramount to a resolution of the dispute between the parties

on appeal." *U.S. ex rel. FCC v. GWI PCS 1, Inc. (In re GWI PCS 1, Inc.)*, 230 F.3d 788, 801 (5th Cir. 2000) (citing *In re Manges*, 29 F.3d at 1041). Here, the occurrence of substantial consummation of the Plan, as defined by the Bankruptcy Code, makes it more likely that the Plan's reversal or modification will "affect the success of the plan or alter the rights of third parties that have been achieved by its substantial consummation." *Insurance Subrogation Claimants v. U.S. Brass Corp. (In re U.S. Brass Corp.)*, 169 F.3d 957, 961 (5th Cir. 1999).

C.    **Appellants' Requested Relief Would Impair the Plan's Success and the Rights of Third Parties Relying on the Plan.**

Each Appellant seeks nothing less than a complete unravelling of the confirmed Plan and the effectively impossible return of the parties to their *status quo ante*. The Advisors (Br. at 42-43) declare that the Plan's supposed defects should have "prevented confirmation," and they ask this Court to "reverse the Confirmation Order and render a decision denying confirmation of the plan." The Trusts (Br. at 21) also ask this Court to "reverse the Order. . . confirming the Debtor's Plan. And the Funds (Br. at 34-35) likewise contend that Plan confirmation was "in error," and ask this Court to "vacate the Confirmation Order" in whole or in substantial part.

Appellants' requests to reverse and vacate the Confirmation Order are consistent with the challenges they make against the Plan. Appellants seek a renegotiated plan *without* Plan Protections that the bankruptcy court found to be "integral" and "necessary" to the Plan's success. ROA.51-52, CO ¶70. Not only would reversal of the Confirmation Order upend the reorganization, but there is no

guarantee that a new, confirmable plan could emerge without the Plan Protections. Those Plan Protections, the bankruptcy court correctly recognized, are critical to key individuals' willingness to support and participate in the post-Effective Date implementation and consummation of the Plan, and to the success of the wind-down effort. *See* ROA.51-58, CO ¶¶70-79. Appellants do not challenge those findings on appeal.

Appellants' challenge to the Plan Protections is thus distinguishable from challenges to exculpations and releases in other cases that this Court found not to be equitably moot. In *Pacific Lumber*, for example, the Court proceeded to address the merits of a confirmed plan's exculpation of its sponsor *by rejecting* that sponsor's contention that the provision was "necessary to their bargain" and without which it would have declined to fund the plan. 584 F.3d at 251-52. "Nothing in the record," the court held, suggested the exculpated parties' co-liability on the debtor's obligations, or any other basis on which to believe the exculpation was integral to the plan's success. *Id.* at 252. Indeed, the Court concluded that the plan sponsor had merely "purchased" the exculpation from the debtor, and that there was no reason to believe that the exculpated claims would "swamp . . . the consummated reorganization." *Id.*; *see also In re Hilal*, 534 F.3d 498 (5th Cir. 2008) (meritless challenge to trustee's release not moot where nothing in plan depended on it). In the unique circumstances of this litigious case, by contrast, the bankruptcy court found

that the Exculpation and other Plan Protections are critically important to the reorganization's success.

The Funds (Br. at 34), unique among Appellants, propose, in the alternative, that this Court might simply "vacate the [Confirmation] Order to the extent it approves the [Plan Protections]." Not so. For starters, 11 U.S.C. § 1127(b) prohibits modifications to confirmed plans after substantial consummation. The statutory limit on post-consummation plan modifications reflects Congress's judgment that it is inequitable to adjust plan terms *after* a plan has been implemented and *after* other parties have relied on it. What is more, given the bankruptcy court's unchallenged findings that the Plan Protections are integral to the Plan and necessary to its success, those provisions cannot be surgically excised from the entirety of the Plan.

Appellants' appeals also seek to rejigger class recoveries in order to prevent a supposed violation of the absolute priority rule, ask that the confirmation process be redone from scratch with the benefit of additional Debtor financial disclosures, and seek to reverse the Debtor's discharge—a primary goal of nearly every bankruptcy. These additional challenges to the confirmed-and-consummated Plan aim at its very core. Each would destroy the multilateral settlements that achieved the Plan, and would undermine the basis on which creditors holding 99.8% of the value of unsecured claims against Highland approved the Plan.

Reversal of the Confirmation Order on any of these grounds would harm the numerous innocent third parties who have relied (and continue to rely) on the

confirmed, effective, substantially consummated Plan. Unscrambling the eggs now would substantially harm these parties that have justifiably relied on the Confirmation Order. It would also result in a chaotic, nearly impossible process of trying to reverse transactions, claw back distributions, restore terminated entities, and otherwise walk back a substantially consummated Plan.

For starters, third-party Blue Torch relied upon the effectiveness and consummation of the Plan when it entered into a $45 million Exit Facility with the Reorganized Debtor and the Portfolio Company. The $20 million borrowed by the Portfolio Company – a valuable estate asset – were used to refinance a maturing loan. A substantial amount of the $25 million loan to the Reorganized Debtor has been spent in support of Plan implementation and post-Effective Date activities. A reversal of the Confirmation Order would, among other things, cause the Reorganized Debtor/borrower to cease to exist, throw the Exit Facility into considerable jeopardy and uncertainty, and likely result in the lender's declaration of a material adverse event and acceleration of the full amount of the $45 million Exit Facility – which is guaranteed by substantially all the assets of the Reorganized Debtor, the Claimant Trust, and the Portfolio Company. It also might imperil Blue Torch's ability to recover through no fault of its own.

Creditors who have already received distributions from the Reorganized Debtor in reliance on the Plan would likely need to restore those funds to the estate and resurrect their discharged claims. Creditors—including Frontier, Acis, and the

17

holders of Convenience Class claims, priority and tax claims, and assumed contract claims—have already received payments pursuant to the Plan. Indeed, some creditors who received distributions on or after the Plan's Effective Date were willing to settle their claims against Highland only in exchange for assurances of prompt payment under the confirmed Plan. It would be demonstrably unfair to all of the creditors that have been paid to require them to restore funds to the estate that they have received in good-faith reliance on the confirmed Plan. Attempting to unravel the Plan and the distributions made under it might well result in an untenable, lengthy, and expensive claw back effort between the estate and its creditors.

Moreover, entities and individuals who have already been implementing and consummating the Plan have been doing so in reliance on the Plan Protections that Appellants challenge on appeal. For instance, the Reorganized Debtor's officers and employees, the Trustees, and TOC members relied on the Confirmation Order and its Plan Protections when they agreed to take their positions. Seery Dec. ¶¶12, 13. They did so knowing that, as the bankruptcy court had found, litigation against them over their implementation and consummation of the Plan would have been "likely" but for the Plan Protections. ROA.55-61, CO ¶¶74-79. Reversing the Plan and thus cancelling the Plan Protections *now* would unfairly deny these individuals, and the successor entities that they manage, the important safeguards under which they reasonably believed themselves to be operating. Not only would these individuals be exposed to litigation for conduct taken after the Effective Date through and

including the date on which the Plan Protections are cancelled, but, based upon the uncontroverted evidence at the confirmation hearing, it is certain that many of the individual protected parties would resign their posts rather than face the onslaught of expected litigation from Dondero, the other Appellants and other Dondero-related entities. That, among the other effects of reversing the Confirmation Order, would disrupt the Reorganized Debtor's operations and result in a significant deterioration in asset values due to uncertainty that a reorganization could ever be achieved.

Importantly, Appellants seeking this chaotic return to bankruptcy have no meaningful financial stake in obtaining such an outcome. As the bankruptcy court found, "the remoteness of [Appellants'] economic interests is noteworthy" and raises serious "questions" about Appellants' "good faith" in objecting to the plan (and, now, pursuing these appeals). ROA.20-21, CO ¶17. Unlike most bankruptcy appeals, therefore, these Plan challenges are not designed to vindicate some perceived economic rights that allegedly were trampled by the confirmed Plan. Rather, it is the Plan's unravelling—full stop—that Appellants are really after. They are, the bankruptcy court had "good reason to believe," acting merely as "disruptors." *Id.* Appellants evidently *want* to bring about the turmoil that would follow the upending of the consummated Plan. Perhaps they have designs on somehow managing to rise from those ashes with Dondero back in control of the estate's assets and its causes of action (including the potential causes of action

against Appellants).  Or perhaps they are simply making good on Dondero's explicit threat to "burn the place down" once he was prevented from retaking control.

As this Court stated in *Manges*, when evaluating the likely effect of reversing a consummated reorganization plan on parties not before the court:

> We must evaluate these transfers, many of which appear irreversible, against the backdrop of the relief sought—nothing less than a wholesale annihilation of the Plan.  All of these third-party recipients and many others have relied upon the Plan, and the irretrievable depletion of estate assets would correspondingly decrease the amounts available to all claimants.  In short, we doubt seriously that we could place the estate or the parties back into the *status quo* as it existed before the confirmation order if we were to unravel the Plan at this time.

29 F.3d at 1043.  So too here.  Numerous creditors and other third parties that are not before this Court have relied on the Confirmation Order, and attempting to return the parties to the *status quo* would be neither feasible nor equitable.

## CONCLUSION

Each of the consolidated appeals should be dismissed as equitably moot.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Judith Elkin (TX Bar No. 06522200)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:     jpomerantz@pszjlaw.com
               ikharasch@pszjlaw.com
               jmorris@pszjlaw.com
               gdemo@pszjlaw.com
               jelkin@pszjlaw.com


-and-


*/s/Zachery Z Annable*
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
**HAYWARD PLLC**
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110


*Counsel for the Appellee*

## CERTIFICATE OF COMPLIANCE

1.     This document complies with the word limit of FED. R. APP. P. 5(c)(1) because, including footnotes and excluding the parts of the document exempted by FED. R. APP. P. 32(f), this document contains 5,126 words.

2.     This document complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word, typeface Times New Roman, 14-point type (12-point for footnotes).

3.     Any required privacy redactions have been made pursuant to Circuit Rule 25.2.13, the electronic submission is an exact copy of the paper submission, and this document has been scanned for viruses and is free of them.

*/s/Zachery Z. Annable*
Attorney for Appellee
Dated: October 7, 2021

# CERTIFICATE OF CONFERENCE

Pursuant to Fifth Circuit Rule 27.4, the undersigned certifies that on October 6, 2021, he conferred by e-mail with counsel for the Appellants as set forth below and they indicated they will be opposing the relief requested in the foregoing *Motion to Dismiss Appeal for Equitable Mootness*:

Counsel for the Advisors:
MUNSCH HARDT KOPF & HARR, P.C.
Davor Rukavina   drukavina@munsch.com
Julian Vasek   jvasek@munsch.com

Counsel for James Dondero:
BONDS ELLIS EPPICH SCHAFER JONES LLP
John Y. Bonds, III   john.bonds@bondsellis.com
Bryan Assink   bryan.assink@bondsellis.com

Counsel for the Funds:
K&L GATES LLP
Artoush Varshosaz   artoush.varshosaz@klgates.com
A. Lee Hogewood, III   A.Lee.HogewoodIII@klgates.com
David Fine   david.fine@klgates.com

Counsel for the Trusts:
HELLER, DRAPER & HORN, L.L.C.
Douglas S. Draper   ddraper@hellerdraper.com
Leslie A. Collins   lcollins@hellerdraper.com
Greta M. Brouphy   gbrouphy@hellerdraper.com

*/s/Jeffrey N. Pomerantz*
Jeffrey N. Pomerantz

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2021, the foregoing motion was electronically filed using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished via CM/ECF.

*/s/Zachery Z. Annable*
Attorney for Appellee

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**In the Matter of: Highland Capital Management, L.P.**

**Debtor.**

**NEXPOINT ADVISORS, L.P.; HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.; HIGHLAND INCOME FUND; NEXPOINT STRATEGIC OPPORTUNITIES FUND;HIGHLAND GLOBAL ALLOCATION FUND; NEXPOINT CAPITAL, INCORPORATED; JAMES DONDERO; THE DUGABOY INVESTMENT TRUST; GET GOOD TRUST,**

**APPELLANTS**

**v.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

**APPELLEE**

ON DIRECT APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS
BANKRUPTCY CASE NO. 19-34054-11 (SGJ)

# DECLARATION OF JAMES P. SEERY IN SUPPORT OF APPELLEE'S MOTION TO DISMISS APPEAL AS EQUITABLY MOOT

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz
Ira D. Kharasch
Harry Hochman
Gregory V. Demo
Judith Elkin
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910

**HAYWARD PLLC**
Melissa S. Hayward
Zachery Z. Annable
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100

**ATTORNEYS FOR APPELLEE**

## Declaration of James P. Seery, Jr. in Support of Appellees Motion to Dismiss Appeal as Equitably Moot

I, James P. Seery, Jr. pursuant to 28 U.S.C. § 1746(a), declare as follows under penalty of perjury:

1.      Prior to August 11, 2021, I was the chief executive officer and chief restructuring officer of Debtor Highland Capital Management, L.P. ("Highland" or the "Debtor") and a member of the independent board of directors of Strand Advisors, Inc., Highland's former general partner ("Strand").  I was appointed to those roles by order of the Bankruptcy Court dated January 9, 2020 and July 16, 2020 and was not previously affiliated with Highland or any of its affiliates or creditors in any way.  I am currently the chief executive of Highland, as reorganized pursuant to the terms of the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "Plan").[1]

2.      I have personal knowledge of all facts set forth herein.  I submit this Declaration in support of *Highland's Motion to Dismiss Appeal as Equitably Moot*.

3.      On February 22, 2021, the U.S. Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") entered the *Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* (the "Confirmation Order") which

---

[1] All capitalized terms used but not defined herein have the meanings given to them in the Plan.

confirmed the Plan. In doing so, the Bankruptcy Court overruled the only objections to confirmation argued at the confirmation hearing, all of which were filed by Appellants and other Dondero-related entities not party to this Appeal.

4.  The Debtor filed for chapter 11 bankruptcy on October 16, 2019.

5.  On January 9, 2020, the Bankruptcy Court entered an order approving what has been referred to as the "Governance Settlement" which:

> a.  Created an independent board of directors at Strand, the Debtor's former general partner, consisting of John Dubel, and retired bankruptcy judge Russell Nelms and me (the "Independent Directors").
>
> b.  Removed James Dondero, one of the Debtor's founders and ultimate owners, from his control positions at the Debtor and Strand, which removal was negotiated with and agreed to by Mr. Dondero. Mr. Dondero is the 100% owner of Strand. Mr. Dondero remained as an unpaid portfolio manager at the discretion of the Independent Directors until he was asked to resign for taking actions detrimental to the Debtors such as cancelling trades and threatening employees.
>
> c.  Imposed a number of stringent operating protocols (the "Protocols" that obligated the Debtor to make detailed disclosures regarding its financial operations and those of its non-debtor subsidiaries and gave the Committee substantial oversight over how the Debtor managed its assets, subsidiaries, and investment vehicles. I was intimately involved with insuring the Debtor's compliance with these Protocols throughout the case.
>
> d.  Granted standing to the Unsecured Creditors' Committee (the "Committee") to pursue certain estate claims and causes of action (the "Estate Claims") against Mr. Dondero, other insiders of the Debtor, and other "Related Entities" (as defined in the Protocols).
>
> e.  Prohibited Mr. Dondero from causing any "Related Entity" (as defined in the Protocols) to terminate any agreements with the Debtor.

f. Provided that the Debtor would guaranty the indemnification obligations of Strand to the Independent Directors and would acquire D&O insurance for the benefit of the Independent Directors.

g. Installed the Bankruptcy Court as a "gatekeeper" with respect to any litigation commenced against the Independent Directors, their agents and advisors and exculpated the Independent Directors and their agents and advisors from claims arising from ordinary negligence.

6. On July 16, 2020, the Bankruptcy Court entered the order approving my appointment as Chief Executive Officer and Chief Restructuring Officer of the Debtor effective as of March 15, 2020. This order contained exculpation and gatekeeper protections similar to those set out in the January 9 Order described above. I personally negotiated the gatekeeper and exculpation provisions and required their inclusion in the appointment orders.

7. Throughout the course of the case, I was intimately involved in (i) the negotiation of settlements with various major creditor constituencies such as UBS, Acis and HarbourVest, (ii) the development of plan strategies and negotiation of a potential plan of reorganization with the Committee as well as with Mr. Dondero, (iii) the structure and negotiation of the Plan that was ultimately confirmed by the Bankruptcy Court, and (iv) the day to day operations of the Debtor's various business operations as well as compliance with the Protocols. During the plan negotiation process in the summer of 2020, Mr. Dondero told me that if he did not get what he wanted he would "burn the place down."

8.     After the entry of the Governance Settlement and escalating in October 2020 when Mr. Dondero was required to resign and it became apparent his plan proposals would not be accepted, every major motion filed by the Debtor and approved by the Bankruptcy Court was appealed by one or more of Mr. Dondero or his other numerous related entities.  Additionally, the Debtor has been sued by one or more of Mr. Dondero or his other related entities for actions taken during the case and approved by the Bankruptcy Court.  This pattern of harassment has continued post-confirmation with numerous lawsuits being filed by Dondero-related entities necessitating the filing of motions for contempt and causing Highland to incur significant costs in defense of various litigation.

9.     The Plan was confirmed on February 22, 2021 after a two-day evidentiary hearing.  The Plan provides for the restructuring of the ownership of the Debtor and the creation of a Claimant Trust managed by the Claimant Trustee and a Litigation Sub-Trust managed by the Litigation Trustee.  Those trustees will manage certain of the Debtor's businesses in a limited capacity, pursue the Debtor's causes of action, monetize the Debtor's assets and distribute the proceeds to the Debtor's creditors over a period estimated to be 2-3 years, but subject to extension as necessary, to maximize the value of the assets of the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust.

10.     After confirmation of the Plan, I was involved in the negotiation and execution of all documents and transactions necessary to reach the Effective Date, including the creation of the Claimant Trust, the Litigation Sub-Trust, the Indemnity Trust, and the finalization of the exit financing discussed below.

11.     Subsequently, on August 11, 2021, the Plan went effective (the "<u>Effective Date</u>") and since that time has been substantially consummated.  Since the Effective Date, the following transactions contemplated by the Plan have taken place:

      a.     The Claimant Trust was created as a Delaware liquidating trust. The owners of the Claimant Trust are the Claimant Trust Beneficiaries (currently, the holders of allowed Class 8 General Unsecured Claims and 9 Subordinated Claims).  I serve as the Claimant Trustee.

      b.     The Independent Directors and the CEO/CRO have each resigned their respective positions with Strand and the Debtor, which no longer exists in its pre-Effective Date form.  In addition to serving as the Claimant Trustee, I serve as the chief executive officer of the Reorganized Debtor.

      c.     The Claimant Trust Oversight Committee ("<u>TOC</u>") has been appointed to manage and oversee the Claimant Trust and consists of designees of two of the largest creditors of the Debtor and a third independent director with no prior involvement with Highland or the bankruptcy case.

      d.     The Litigation Sub-Trust has been created as a sub-trust of the Claimant Trust, and Marc Kirschner serves as the Litigation Trustee.  Mr. Kirschner is a senior managing director at Teneo, and prior to being retained as the Committee's litigation consultant in 2021, had no prior involvement with Highland.  Mr. Kirschner is actively investigating the Debtor's causes of action and anticipates filing lawsuits on such causes of action on or before October 16, 2021.

e.      The prepetition limited and general partnership interests in the Debtor have been cancelled.

f.      New limited partnership interests in the Reorganized Debtor have been issued to the Claimant Trust, which is the sole limited partner of the Reorganized Debtor holding 99% of its partnership interests.

g.      HCMLP GP LLC ("New GP") has been incorporated as a wholly-owned subsidiary of the Claimant Trust.

h.      New GP is the general partner of the Reorganized Debtor and holds the remaining 1% of its partnership interests.

i.      The Debtor's assets have been transferred to the Reorganized Debtor or the Claimant Trust, as applicable.

j.      The Estate Claims have been transferred to the Litigation Trust. The Estate Claims include claims against Appellants and other Dondero-related entities.

k.      The Indemnity Trust has been created as a special purpose vehicle collateral trust to secure the obligation to pay any indemnification claims that may arise against the Reorganized Debtor, the Claimant Trust and Litigation Sub-Trust, the Trustees or members of the TOC.

l.      The Indemnity Trust has been funded with $2.5 million cash and a note issued by the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust in an amount equal to $25 million less the value of assets held at the Indemnity Trust.

m.      All claims required to be paid in cash on the Effective Date have been paid.  These claims totaled approximately $2.2 million in the aggregate and included a cash payment to major litigation creditor Acis as required under the Acis settlement agreement.

n.      Class 1 secured creditor Jefferies has withdrawn its claim against the Debtor due to the occurrence of the Effective Date.

o.      Class 2 secured creditor Frontier State Bank ("Frontier") has been paid all accrued and unpaid interest outstanding on the Frontier note in the approximate amount of $500,000, and the Reorganized Debtor has issued the New Frontier Note to Frontier in the principal amount of approximately

$5.2 million secured by approximately $23 million of the Reorganized Debtor's assets.

p.      A $45 million exit facility with Blue Torch Capital ("<u>Blue Torch</u>") has been consummated (the "<u>Exit Facility</u>").  Blue Torch has funded (i) a $25 million term note issued by the Reorganized Debtor and (ii) a $20 million term note issued by a portfolio company indirectly owned by the Reorganized Debtor.  Blue Torch is a middle market lender with no prior history with the Debtor or the bankruptcy case.

q.      The Exit Facility is fully guaranteed by the Reorganized Debtor, the Claimant Trust and the Reorganized Debtor's material operating subsidiaries and secured by substantially all the assets of the Reorganized Debtor, the Claimant Trust and the Reorganized Debtor's material operating subsidiaries.

r.      Approximately $5.1 million has been paid to unsecured creditors holding allowed Class 7 Convenience Claims, representing 77% of all Class 7 claims filed.  The process of resolving and paying additional Convenience Claims is ongoing.

s.      Payments in the aggregate amount of $165,412 have been made to holders of Other Secured, Priority Non-Tax and Priority Tax Claims.

t.      Allowed Class 8 General Unsecured Claims have received their Claimant Trust Interests.

u.      Pursuant to the Plan, the Debtor assumed a number of contracts necessary for the continuing operation of the Reorganized Debtor and the Claimant Trust, including contracts pursuant to which it manages 20 collateralized loan obligations with approximately $700 million in aggregate assets under management.  Cure payments in the amount of $525,000 have been paid to the applicable contract counterparties.

v.      The Reorganized Debtor obtained a new EIN on the Effective Date, has 12 employees under employment contracts, and withholds taxes for those employees under the new EIN.

12.      When I accepted the positions as an Independent Director and

CEO/CRO of the Debtor, I negotiated for and expressly relied on the exculpation

and gatekeeper provisions of the January 9, 2020 and July 16, 2020 orders of the Bankruptcy Court as well as on the indemnification obligations of Strand and the Debtor (including the Debtor's express guaranty of the Strand indemnification obligations which I also required). As with my pre-Effective Date positions as an Independent Director and CEO/CRO of the Debtor, in accepting my position as Trustee of the Claimant Trust and CEO of the Reorganized Debtor, I expressly relied on the exculpation, gatekeeper and indemnification provisions contained in the Plan and the various trust and corporate documents approved as part of the Plan. Those provisions are essential to my being able to administer the Claimant Trust and Reorganized Debtor, effectuate the transactions described above and in the Plan, and operate and administer the assets of the Claimant Trust and Reorganized Debtor in furtherance of the Plan.

13. Based on my experience working as an Independent Director of the Debtor and a professional and investor in reorganized companies, I believe the Litigation Trustee and the members of the TOC are similarly relying on these Plan protections.

Signed this 6th day of October, 2021.

_____/s/ James P. Seery, Jr._____
James P. Seery, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2021, the attached Declaration of James P. Seery was electronically filed using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished via CM/ECF.

*/s/Zachery Z. Annable*
Attorney for Appellee